## WOMACK v EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES

Ohio Appeals, 1st Dist, Butler Co.

No. 780.   Decided April 16, 1940.

Casper & Casper, and Fred B. Cramer, Middletown, for appellee.

Millikin, Shotts & Reister, Hamilton, and Maxwell & Ramsey, Cincinnati, for appellant.

### OPINION

By ROSS, J.

The plaintiff brought suit upon a group insurance policy issued in the year 1921.   Generally speaking, the policy provided that if the insured became totally and presumably permanently disabled before reaching the age of sixty, he should be entitled to certain benefits.   It did not require the giving of notice of such condition at any particular time.

The plaintiff suffered an injury in May, 1926, through which the bones of his foot were crushed.   There can be no question that he never recovered fully from the effects of this injury. His leg was amputated in May, 1934.

During the intervening period, he suffered from running sores, varicose veins, and infections of the bone coverings in the injured member.

The evidence is also conclusive that immediately after the injury in May, 1926, he ceased all work until August, 1926, the same year.   The evidence is just as conclusive that from such latter date until he finally left the employ of his employer in 1933 he worked comparatively steadily. At first, he was given light work, but returned to his former tasks in less than a year.   He worked steadily at his former employment until a new type of machine was installed.   After this, while his work changed in character, it was evidently as strenuous as his former employment.   The plaintiff during this period increased the amount of his coverage, justified by increase in pay.

The first notice of any claim of disability under the policy in question was given the defendant on February 14th, 1938.   The plaintiff became sixty years of age May 10, 1932.   His leg was amputated on May 8, 1934.   It must be borne in mind that in spite of these facts the plaintiff claims he was "totally and presumably permanently disabled", from May 22, 1926 until May 10, 1932, when he became sixty years of age.   It is perfectly obvious that such could not be the case even giving the plaintiff the widest possible latitude in the construction of the terms of the contract and the most favorable view of the facts.   Plaintiff was asked as to previous testimony given before a Mr. Ogg.   His testimony in the record is as follows:

"Mr. Womack, yesterday I recalled to you the fact that in November, 1932 you had appeared before Mr. Stanley Ogg and he asked you some questions and you answered them and there was a stenographer there and took down the questions and answers and you said whatever you told Mr. Ogg was true to the best of your knowledge?

Mr. Cramer, attorney for plaintiff: Let the record show the plaintiff objects to all questions being asked of Mr. Womack at this time.

Objection overruled by the Court. To which ruling of the Court, plaintiff at the time excepts.

A. Yes.

Q. I will ask you whether or not Mr. Ogg asked you this question and you gave this answer:

'Q. Are you employed at this time?

A. American Rolling Mill Company.'

Do you remember that?

A. Yes.

'Q. What kind of work do you do?

A. Charging on No. 1 furnace.

Q. Will you describe that work?

A. I am a charger helper. I handle the tongs.'

Do you remember that?

A. Yes.

'Q. What do you handle with these tongs?

A. I hande heavy iron with the tongs and charge through No. 1 furnace.'

Do you remember that?

A. Yes.

And the next question—'What kind of iron—scrap iron?

A. Some is grave vault stock. No scrap iron.'

Do you remember that?

A. Yes.

'Q. Is this iron that you handled heavy?

A. Yes sir.'

A. Yes.

'Q. Are you able to handle it by yourself?

A. No sir, it takes two to handle it.'

Do you remember that?

A. Yes.

'Q. Do you grab the iron with tongs?

A. Yes.

Q. Do you lift the iron?

A. Yes sir. Got a roll right on the table, lift it up on this table and then charge it into the furnace.'

Do you remember that?

A. Yes.

'Q. How high off the floor is this table?

A. About three feet high to my judgment

Q. How long have you been engaged in that kind of work?

A. About two years.'?

A. Yes.

And

'Q. Prior to two years ago, what kind of work did you do?

A. Well, I drove down heavy blocks, same kind of iron. I drove them down from the furnace to the mill.'

Remember that?

A. Yes.

'Q. Approximately how long did you do that kind of work?

A. I started on that work in about 1924.'

Rememer that?

A. Yes.

'Q. Then in 1926 when you were injured you were doing what you call driving down?

A. When I got injured I was mill wrighting. We generally had to mill-wright every Saturday and I was mill-wrighting when I got injured.'

Remember that?

A. Yes.

'Q. You were injured, according to your first notice of injury filed, on May 22, 1926 and you returned to work on July 12, 1926. When you returned to work after this period of disability resulting from that injury, what kind of work did you start doing then?

A. They first started me out scrapping on the shears. It was light work. I wasn't able to go back to my regular job so they put me back on scrapping.'

Is that true?

A. Yes.

'Q. Then later on, did you go back on your old job?

A. Yes sir, when I was able I went back to my old job.'

A. That is right.

'Q. Did you work steady on that job?

A. Yes sir.'

A. Yes sir.

'Q. After you went back on your regular work did you lose any time because of this injury that you had in 1926?

A. Yes sir, in 1930 I was on my job and my leg busted and that stopped me.'

Remember that?

A. That is right.

'Q. Which leg was that?

A. The right leg. The same leg that got hurt.'

A. Yes.

'Q. How long were you away from work at that time?

A Something like about three months.'

A. That is right.

'Q. That was in the year of 1930?

A. Yes sir, in the year of 1930.

Q. Did you have to quit work at any other time?

A. Not until 1932 when my leg got inflammed. The Doctor was working on it and I was continuing on work as long as I could go on and on June 3 I made my last shift and on June 4 I was taken to my bed and I was in bed until a couple of weeks ago and I come here the other day and signed up to come back to work.'

Is that right?

A. Right.

Q. And again Mr. Ogg asked you:

'Q. Are you doing the same kind of work now that you did at the time you were injured?

A. Yes sir.'

A. Yes.

Q. That was November, 1932?

A. Yes.

Q. Then he asked you:

'Q. Are you able to do your work just the same as the other men on your shift?

A. Yes, sir.'

Is that right?

A. Right.

'Q. Can you tell us whether or not your wages have ever been reduced?

A. Not as I know of. Only when they cut wages.

Q. You mean when they cut wages because of slack operation?

A. Yes sir.'

You said that?

A. Yes.

'Q. Then would you say you were just as able to do your work as before you were injured?

A. Yes sir, so long as I ain't hurting I am just as able as I ever was.'

A Yes.

'Q. How many hours are you working per day?'

That was November, 1932 and you answered: 'Six'. Is that right?

A. Yes.

'Q. Is that regular work hours of the company at this time?

A. Yes sir.'

A. Yes sir.

And:

'Q. Approximately how many days a week?

A. I don't know. I have just started. They have been working three and four days a week.

Q. Would you be able to work full time if they had work for you?

A. Sure.'

Is that right?

A. Yes.

'Q. Is there anything else you want to tell us about your case that we haven't asked you? Anything that you think will assist the Industrial Commission in determining the extent of your disability?

A. I just didn't understand what you meant by a hundred per cent disability.

Q. Do you understand now what I mean by a hundred per cent disability?

A. I don't think I am a hundred per cent disabled now.'

Is that what you said?

A. Maybe I did. I guess so."

We quote in part the pertinent language of the policy certificate:

"Total and Permanent Disability Provision, Contained in within Mentioned Policy.

If proof shall be furnished the Society that any Employee insured under the aforesaid policy has before having attained the age of 60, become wholly disabled by bodily injuries or disease, and will be wholly and presumably permanently prevented thereby for life from pursuing any and all gainful occupation, the Society will pay six months after receipt of such proof in full settlement of all obligation under the said policy pertaining to such Employee, the full amount of the insurance on such life either in a single sum; or at the option of the Employer, will pay the equivalent thereof in a fixed number of equal annual installments as set forth in the table below; the first installment to be payable six

months after receipt of due proof of such permanent total disability and the remainder annually thereafter."

The defendant also claims that by reason of the delay in making a claim under the policy of 1921, from 1926, when it is claimed the disability occurred, or even from 1932, when plaintiff became sixty years of age, until 1938, that the plaintiff should be nonsuited. The difficulty with this contention is, that the defendant did not assert this as a separate defense. It relies upon the fact that the plaintiff alleged he had duly performed all things required of him under the policy, and defendant claims the general denial put this matter in issue.

We cannot agree with this contention, especially as the policy of 1921 required no definite time for giving notice.

The defendant relies upon a further ground for non-suit.

In 1932, actually dated August 22, 1932, a new group policy was substituted for the former group policy of 1921. An individual certificate was issued to the plaintiff, bearing the following statement:

"This certificate is issued as a substitute for and supersedes any group insurance certificate heretofore issued to the Employee hereinafter named."

The plaintiff authorized his employer to make deductions under this policy from his wages. The policy of 1921 was a non-contributing policy.

If any liability, by reason of the terms of the policy of 1921, had become vested in the plaintiff, it would not be divested by the acceptance of the new policy. No claim is made by the plaintiff under the new policy, and if any were made it would be barred by a provision therein that notice of disability must be given under such latter policy within one year from the inception thereof.

We conclude that the plaintiff having failed to show total and presumably permanent disability under the policy of 1921, the trial court should have instructed a verdict in favor of the defendant, and that it now becomes incumbent upon this court to enter the judgment which the trial court should have rendered, and judgment may be accordingly entered for the defendant.

HAMILTON, PJ. & MATTHEWS, J., concur.